1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MCKOOL SMITH HENNIGAN, P.C.
Roderick G. Dorman (SB 96908)
rdorman@mckoolsmithhennigan.com
300 S. Grand Ave., Suite 2900
Los Angeles, CA 90017
Telephone: (213) 694-1006

MCKOOL SMITH, P.C.
John B. Campbell (*admitted pro hac vice*)
jcampbell@McKoolSmith.com
Kevin L. Burgess (*admitted pro hac vice*)
kburgess@McKoolSmith.com
Lindsay Martin Leavitt (*admitted pro hac vice*)
lleavitt@McKoolSmith.com
Kathy H. Li (*admitted pro hac vice*)
kli@McKoolSmith.com
Matthew B. Rappaport (*admitted pro hac vice*)
mrappaport@McKoolSmith.com
McKool Smith, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone:   (512) 692-8700
Facsimile:   (512) 692-8744

Attorneys for Plaintiff
ODYSSEY WIRELESS, INC.

McKool Smith, P.C.
Austin, TX

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
## SAN DIEGO DIVISION

| | |
|---|---|
| ODYSSEY WIRELESS, INC., | ) |
| Plaintiff, | ) Case No. 3:15-CV-01743-H-RBB |
| | ) |
| v. | ) **PLAINTIFF ODYSSEY'S** |
| | ) **MEMORANDUM OF POINTS** |
| LG ELECTRONICS, INC., *et al.*, | ) **AND AUTHORITIES IN** |
| | ) **OPPOSITION TO** |
| Defendants. | ) **DEFENDANTS' MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| | ) |
| | ) Date:  September 12, 2016 |
| | ) Time: 10:30 a.m. |
| | ) Judge: Hon. Marilyn L. Huff |

1   ODYSSEY WIRELESS, INC.,                    )       Case No. 3:15-CV-01741-H-RBB

2                        Plaintiff,             )

3              v.                               )

4   MOTOROLA MOBILITY LLC,                      )

5                        Defendant.             )

6                                               )

7   ODYSSEY WIRELESS, INC.,                     )

8                        Plaintiff,             )       Case No. 3:15-CV-01738-H-RBB

9              v.                               )

10  SAMSUNG ELECTRONICS AMERICA,                )
    INC.,
11                                              )

12                       Defendant.             )

13                                              )

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKool Smith, P.C.
Austin, TX

# TABLE OF CONTENTS

**Page(s)**

I       INTRODUCTION ................................................................................. 1

II      LEGAL BACKGROUND ..................................................................... 3

III     ARGUMENT ....................................................................................... 4

    A.     Odyssey's Claim To A Pre-Filing Invention Date Is Not Precluded As A Matter Of Law. .......................................... 4

    B.     The '606, '230, And '393 Patents Can Properly Claim Priority To The July 2005 Provisional Application And The May 2006 Application. .......................................................................... 6

    C.     Defendants' LTE Products Infringe The Asserted Claims That Require A "Waveform Alphabet." ................................ 9

        1.     Defendants' LTE Products Use Waveform Alphabets. ............. 9

            a.     Defendants improperly narrow the Court's construction of the "waveform alphabet." ....................... 9

            b.     Whether LTE devices satisfy the "waveform alphabet" requirement is a factual dispute. .................. 10

            c.     There is correspondence in LTE between the information symbols and the output waveforms. ............ 12

            d.     Defendants' remaining attacks on Odyssey's waveform alphabet theory fail. ..................................... 16

            e.     Defendants' other arguments do not eliminate factual disputes. ...................................................... 19

        2.     Odyssey's Doctrine Of Equivalents Arguments Do Not Fail As A Matter Of Law. ...................................................... 21

    D.     The Asserted "Frequency Variation" Claims Are Not Obvious. ....... 22

        1.     Galda Does Not Teach Or Suggest "Frequency Variation." ................................................................................ 22

        2.     Odyssey's Secondary Considerations Of Nonobviousness Are Legally Sufficient And Present Issues To Be Considered By The Trier Of Fact. ................................................... 24

    E.     The Court Should Not Grant Summary Judgment on Damages. ......................................................................... 25

IV      CONCLUSION ................................................................................. 25

McKool Smith, P.C.
Austin, TX

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5
*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................3

6

7
*Berry v. Webb*,
    412 F.2d 261 (CCPA 1969) ......................................................6

8

9
*Brown v. Barbacid*,
    276 F.3d 1327 (Fed. Cir. 2002) ................................................5

10

11
*Chen v. Bouchard.*
    347 F.3d 1299 (Fed. Cir. 2003) ................................................5

12

13
*Comark Communications, Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998)...............................................22

14

15
*Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech.*
    *(USA), Inc.*,
    542 F.3d 1363 (Fed. Cir. 2008) ...............................................24

16

17
*Cordis Corp v. Boston Scientific Corp.*,
    658 F.3d 1347 (Fed. Cir. 2011) .........................................17, 23

18

19
*Falkner v. Inglis*,
    448 F.3d 1357 (Fed. Cir. 2006) .........................................2, 7, 8

20

21
*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966)...................................................................24

22

23
*Hahn v. Wong*,
    892 F.2d 1028 (Fed. Cir. 1989) ................................................5

24
*Hodosh v. Block Drug Co., Inc.*,
    786 F.2d 1136 (Fed. Cir. 1986) ................................................3

25

26
*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) ................................................4

27

28
*Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*,
    755 F.2d 158 (Fed. Cir. 1985) ..................................................3

McKOOL SMITH, P.C.
AUSTIN, TX

*LizardTech, Inc. v. Earth Resource Mapping, PTY, Inc.,*
   424 F.3d 1336 (Fed. Cir. 2005) ....................................................... 7, 8

*Martek Biosciences Corp. v. Nutrinova, Inc.,*
   *579 F.3d 1363 (Fed. Cir. 2009)*....................................................... 4

*Medichem, S.A. v. Rolabo, S.L.,*
   437 F.3d 1157 (Fed. Cir. 2006) ....................................................... 5

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.,*
   527 F.3d 1330 (Fed. Cir. 2008) ....................................................... 3

*Mikus v. Wachtel,*
   542 F.2d 1157 (CCPA 1976) ....................................................... 6

*Multimedia Patent Tr. v. Apple Inc.,*
   2012 U.S. Dist. LEXIS 191199 (S.D. Cal. Nov. 20, 2012)................................ 9, 20

*Perfect Web Techs., Inc. v. InfoUSA, Inc.,*
   587 F.3d 1324 (Fed. Cir. 2009) ....................................................... 24, 25

*Price v. Symsek,*
   988 F.2d 1187 (Fed. Cir. 1993) ....................................................... 5, 6

*Proctor & Gamble v. Teva Pharms. USA, Inc.,*
   566 F.3d 989 (Fed. Cir. 2009) ....................................................... 4, 5

*Schumer v. Lab. Computer Sys., Inc.,*
   308 F.3d 1304 (Fed. Cir. 2002) ....................................................... 3, 4

*Singh v. Brake,*
   222 F.3d 1362 (Fed. Cir. 2000) ....................................................... 4, 5, 6

*Tecsec, Inc. v. Adobe Sys.,*
   2016 U.S. App. LEXIS 15149 (Fed. Cir. Aug. 18, 2016) ................................ 19

*Texas Instruments v. Cypress Semiconductor,*
   90 F.3d 1558 (Fed. Cir. 1996) ....................................................... 22

*TiVo, Inc. v. Echostar Communs. Corp.,*
   516 F.3d 1290 (Fed. Cir. 2008) ....................................................... 10, 20

*Zoltek Corp. v. United States,*
   95 Fed. Cl. 681 (Fed. Cl. 2010) ....................................................... 24

McKool Smith, P.C.
Austin, TX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKool Smith, P.C.
Austin, TX

**TABLE OF EXHIBITS**

| Exhibit No. | Abbreviation | Description |
|---|---|---|
| 1 | Chiang Core Rpt. | Opening Expert Report of Mung Chiang, Ph.D., dated June 30, 2016 ("Core Report") |
| 2 | Chiang Infringement Chart for '393 Patent | Exhibit 4 to Opening Expert Report of Mung Chiang, Ph.D., dated June 30, 2016 ("Core Report") — Infringement Chart for U.S. Patent No. 7,881,393 |
| 3 | Chiang Infringement Chart for '940 Patent | Exhibit 6 to Opening Expert Report of Mung Chiang, Ph.D., dated June 30, 2016 ("Core Report") — Infringement Chart for U.S. Patent No. 8,576,940 |
| 4 | Chiang Rebuttal to Min Rpt. | Rebuttal Validity Report of Mung Chiang, Ph.D., July 27, 2016 (as provided in *Odyssey Wireless, Inc. v. Samsung*, *Odyssey Wireless, Inc. v. Motorola*, and *Odyssey Wireless, Inc. v. LG*) |
| 5 | Galda Appendix in Chiang Rebuttal to Min Rpt. | Appendix K to Rebuttal Validity Report of Mung Chiang, Ph.D., July 27, 2016 (as provided in *Odyssey Wireless, Inc. v. Samsung*, *Odyssey Wireless, Inc. v. Motorola*, and *Odyssey Wireless, Inc. v. LG*) |
| 6 | Chiang Decl. In Support of Odyssey's Responsive Claim Construction Brief | Declaration Of Dr. Mung Chiang in Support of Plaintiff's Responsive Claim Construction Brief (Dkt 167-1, March 10, 2016) |
| 7 | Chiang Tr. | Excerpts from Deposition Transcript of Dr. Mung Chiang, Aug. 4-5, 2016 |
| 8 | 3GPP TS 36.211 | 3GPP Technical Specification 36.211 v8.9.0 |

McKool Smith, P.C.
Austin, TX

| 9 | Min Tr. | Excerpts from Deposition Transcript of Paul Min, Aug. 19, 2016 |
|---|---|---|
| 10 | Valenti Tr. | Excerpts from Deposition Transcript of Matthew Valenti, Aug. 24, 2016 |
| 11 | '393 Patent | U.S. Patent No. 7,881,393 |
| 12 | Webster's Encyclopedic Unabridged Dictionary of the English Language (1996) | Excerpt from Webster's Encyclopedic Unabridged Dictionary of the English Language (1996) ("plurality") |
| 13 | Dictionary of Science and Technology (1992) | Excerpt from Dictionary of Science and Technology, Academic Press (1992) ("set") |
| 14 | Proakis | Excerpt from John G. Praoakis, "Digital Communications," Fourth Edition, McGraw Hill (2000) at ODY_PRIOR_ART_00001777-78 |
| 15 | Couch | Excerpt from Leon W. Couch, "Modern Communication Systems Principles and Applications," Prentice-Hall (1995) at ODY_PRIOR_ART_00001637-38 |
| 16 | Galda | "A Low Complexity Transmitter Structure for OFDM-FDMA Uplink Systems," by Dirk Galda and Hermann Rohling, IEEE Vehicular Technology Conference, Spring 2002 (ODY_PRIOR_ART_00074019- 42) |
| 17 | Acampora Decl. ISO Defendants' Opening Claim Construction Brief | Excerpt from Declaration of Anthony Acampora, Ph.D. Regarding Claim Construction (Feb. 25, 2016) |

| 18 | Federal Circuit Bar Association Model Patent Jury Instructions (Jan. 2016) | Excerpt from the Federal Circuit Bar Association Model Patent Jury Instructions (January 2016) |
|---|---|---|

# I       INTRODUCTION

Defendants' Motion for Summary Judgment ("Motion")[1] should be denied in its entirety. Several of Defendants' arguments are based on inaccurate statements of law or improper narrowing of the Court's claim constructions. Defendants' remaining arguments, at best, implicate genuine disagreements among the parties' experts and attendant issues of material fact that preclude summary judgment. At worst, Defendants' remaining arguments are straw man attacks on positions Odyssey has not advanced, which do not address the substance of Odyssey's infringement and validity evidence.

Defendants direct arguments in support of their motion for summary judgment of non-infringement at infringement theories that Odyssey has never advanced.

Defendants' arguments also are premised on an unjustifiably narrow view of the Court's claim constructions.

---

[1] Defendants are Samsung Electronics America, Inc.; Motorola Mobility LLC; LG Electronics U.S.A., Inc.; and LG Electronics Mobilecomm U.S.A., Inc. Docket numbers are referenced herein from Case No. 3:15-cv-01738-H-RBB (*Odyssey v. Samsung*). Defendants' Memorandum of Points and Authorities in Support of its Motion for Summary Judgment (Dkt. 247-1, Aug. 15, 2016) is cited to herein as "D.Br."

McKOOL SMITH, P.C.
AUSTIN, TX

1 ████████████████████████ But that argument finds no purchase in the Court's claim

2 construction, which simply requires a "waveform alphabet" be a "set of discrete-time

3 waveforms that correspond to a set of specific information symbols." Chiang Core

4 Rpt. at 13 (citing the Court's claim construction order). ████████████████

5 █████████████████████████████████████████████████████

6 ████████████████████████████

7 ████████████████████████████████████████████████

8 █████████████████████████████████████████████████████

9 █████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████

14 █████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████

17 ███████████████████████████████████████

18 ████████████████████████████████████████████████

19 █████████████████████████████████████████████████████

20 █████████████████████████████████████████████████████

21 ████████████████████████████████████ Defendants' argument

22 presumes that in order to provide adequate written description support, a specification

23 must describe every embodiment that might fall within the claims. However, the law

24 is contrary. *See Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006). As Dr.

25 Chiang has explained, the July 2005 application includes numerous teachings of

26 Fourier transforms, and one of skill in the art would be charged with "knowledge of

27 what has come before," which includes both Fourier transforms and inverse Fourier

28

MCKOOL SMITH, P.C.
AUSTIN, TX

transforms. Chiang Rebuttal to Min Rpt. ¶¶ 59-60, 64, and 65. Thus, one of ordinary skill in the art would understand that Dr. Karabinis was in possession of the claimed inventions, including their "Fourier transform" and "inverse Fourier transform" aspects, as of the filing of the July 2005 application, precluding a finding of summary judgment.

Defendants' motion for summary judgment should be denied. To the extent that Defendants' arguments address Odyssey's evidence and are based on a correct understanding of the law, they distill down to genuine issues of material fact.

## II    LEGAL BACKGROUND

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether any material fact is in dispute, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Courts must look beyond the arguments and "resolve all doubt over factual issues in favor of the party opposing summary judgment." *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985). Under this standard, any "conflict in [expert] declarations" will create "a genuine issue of material fact that [makes] summary judgment inappropriate." *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1338-39 (Fed. Cir. 2008). In short, a battle of the experts should not be resolved at summary judgment. *Hodosh v. Block Drug Co., Inc.*, 786 F.2d 1136, 1143 (Fed. Cir. 1986) ("The fact issues herein must be resolved by trial in which the conflicting views of the experts will be subject to the refining fire of cross-examination.").

Furthermore, because Odyssey's patents are presumed to be valid, Defendants must carry a high burden in its motion for summary judgment of invalidity. *See Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002) ("The

McKool Smith, P.C.
Austin, TX

burden of proving invalidity on summary judgment is high."). Defendants must show that—when all of the expert testimony supporting Odyssey is believed, and every relevant conflict and factual doubt is resolved against Defendants—there still remains uncontroverted, clear and convincing evidence that Odyssey's patents are invalid. *Schumer*, 308 F.3d at 1316. Defendants' motion for summary judgment comes nowhere near this exacting standard.

## III    ARGUMENT

### A.    Odyssey's Claim To A Pre-Filing Invention Date Is Not Precluded As A Matter Of Law.

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██  Defendants' argument is flawed in two respects.

First, Defendants misstate the standard by which conception evidence is judged, citing instead to case law that concerns the "more stringent" standard of proof that applies in "reduction to practice" analysis. *Singh v. Brake*, 222 F.3d 1362, 1369–70 (Fed. Cir. 2000) (reaffirmed in *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1376 (Fed. Cir. 2009)). The standard established by the Federal Circuit allows a laboratory notebook, alone, to serve as corroborating evidence of conception:

> We are left with the definite and firm conviction that a mistake has been committed because the district court's account of the evidence that "there was no credible evidence of conception before May 1980" is insupportable. There is such evidence. The laboratory notebooks, alone, are enough to show clear error in the findings that underlie the holding that the invention was not conceived before May 1980. That some of the notebooks were not witnessed until a few months to one year after their writing does not make them incredible or necessarily of little corroborative value.

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1378 (Fed. Cir. 1986).

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

McKOOL SMITH, P.C.
AUSTIN, TX

Defendant's reliance on *Proctor &Gamble,* however, is misplaced. *Proctor & Gamble* concerned the standard applicable to reduction to practice, not conception. In *Procter & Gamble* the Court's requirement that "[t]he inventor must provide independent corroborating evidence in addition to his own statements and documents" concerned proof surrounding the inventors *synthesis* of the compound in question, which is an act of reduction to practice. *See Proctor & Gamble*, 566 F.3d at 992. Moreover, Defendants' reading of *Procter & Gamble* is belied by the fact that both of the cases cited by the *Procter & Gamble* decision—*Hahn v. Wong*, 892 F.2d 1028 (Fed. Cir. 1989) and *Chen v. Bouchard*. 347 F.3d 1299 (Fed. Cir. 2003)—have been held by the Circuit to concern only reduction to practice, not conception. *See Singh v. Brake*, 222 F.3d 1362, 1369 (Fed. Cir. 2000) ("[W]e also disagree with Brake's contention that *Hahn v. Wong* nullifies the corroborative value of the laboratory notebook entries. That case dealt with the standard of proof required to corroborate a reduction to practice, a more stringent standard than that required to corroborate a conception."); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1172 n.10 (Fed. Cir. 2006) (in "*Chen v. Bouchard*, this court affirmed the decision of the Board of Patent Appeals and Interferences to exclude as inadmissible hearsay a non-inventor's notebooks, which had been offered to corroborate reduction to practice where, as in the instant case, the non-inventor did not testify.")

Second, Defendants fail to include any discussion of the "rule of reason analysis" required in determinations of conception date. *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002). These failings preclude granting finding of summary judgment for Defendants.

Rule of reason analysis is a fact-based, holistic "evaluation of all pertinent evidence," which is designed to determine "the credibility of the inventor's story." *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993) (emphasis in the original). As a holistic evaluation, "[t]here is no single formula that must be followed in proving

corroboration." *Id.* (quoting *Berry v. Webb*, 412 F.2d 261, 266 (CCPA 1969)). The flexibility of the rule of reason analysis is what allows notebooks and statements by the inventor to serve as sufficient corroboration of conception. *See Singh*, 222 F.3d at 1370 (applying the rule of reason and finding that a notebook witnessed years later is sufficient corroboration for conception). The rule of reason provides that an unwitnessed notebook may provide sufficient evidence of conception. *See Mikus v. Wachtel*, 542 F.2d 1157, 1161 (CCPA 1976) (holding that an invention record, based on an unwitnessed laboratory notebook and results performed by technicians unaware of what they were testing, may provide sufficient evidence of conception under the rule of reason). Thus, it would be contrary to the flexible nature of the rule of reason analysis to conclude, as a matter of law, that Dr. Karabinis' lab notebook is insufficient corroboration to prove conception. Such a ruling would be particularly problematic at the summary judgment stage, when all factual inferences must be drawn in favor of the non-movant.

**B.   The '606, '230, And '393 Patents Can Properly Claim Priority To The July 2005 Provisional Application And The May 2006 Application.**

1         ███████████████████████████ As explained by Dr. Chiang, "the full scope

2 of the Fourier transform / inverse Fourier transform limitations of the Asserted Claims

3 are disclosed in the July 2005 application." Chiang Rebuttal to Min Rpt. ¶ 59-68.

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████ Rather, as Dr. Chiang explains:

> Fig. 8 of the July 2005 application represents the power spectral density (*i.e.*, the frequency content) of the time-domain waveform found in Fig. 3. **The power spectral density is a frequency domain representation of the waveform that is brought about by subjecting the time-domain signal $S_L(t)$ found in Fig. 3 to a Fourier transform (indicated by the "F" in the top left of the first trace of Fig. 8)** and then squaring the absolute value of that operation. Taken together, **the teachings of Fig. 3 and Fig. 8 disclose taking the Fourier transform of a timed-domain signal, providing the frequency content of the waveform, and forming the desired spectrum shape of the waveform.**

Chiang Rebuttal to Min Rpt. ¶ 65 (emphases added). For this reason alone, summary

judgment is inappropriate as to any claim calling for the use of a Fourier transform.

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████ There is, however, no requirement that every

20 conceivable embodiment be disclosed in an application that provides written

21 description support. To the contrary, the Federal Circuit has ruled that:

> A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before.

*Falkner v. Inglis,* 448 F.3d 1357, 1366 (Fed. Cir. 2006) (quoting *LizardTech, Inc. v.*

*Earth Resource Mapping, PTY, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005)). The

McKool Smith, P.C.
Austin, TX

1   Federal Circuit explained the rationale for its holding: "it is unnecessary to spell out

2   every detail of the invention in the specification; only enough must be included to

3   convince a person of skill in the art that the inventor possessed the invention and to

4   enable such a person to make and use the invention without undue experimentation."

5   *Falkner*, 383 F.3d at 1366 (quoting *LizardTech*, 424 F.3d at 1345). As Dr. Chiang

6   explains, Defendants demand more than is required:

> Dr. Min ignores that one skilled in the art reading the Patents-in-Suit would understand a Fourier transform and an inverse Fourier transform to be well known. By ignoring the fact that the Fourier transform and inverse Fourier transform are elementary tools for converting between the time domain and the frequency domain, Dr. Min's analysis looks for an effective re-teaching of the very basics of signal processing taught in undergraduate engineering courses—where no such reteaching is necessary to one of skill in the art.

12  Chiang Rebuttal to Min Rpt. ¶ 60.

13      Dr. Chiang cites textbooks that Defendants offered for prior art purposes, which

14  support his statement that the Fourier transform and inverse Fourier transform were

15  well known operations at the time of the invention (Chiang Rebuttal to Min Rpt. ¶ 60).

16  Dr. Chiang then explains:

> Both the Fourier transform and inverse Fourier transform are mathematical operations that are the most basic tools in signal processing to transform a signal from its time-domain representation to its frequency-domain representation (Fourier transform) or from its frequency-domain representation to its time-domain representation (inverse Fourier transform). It is a well-known fact that a Fourier transform operation necessarily provides the frequency content of a waveform.

22  Chiang Rebuttal to Min Rpt. ¶ 64.

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ██████████████████████. Finally, Dr. Chiang explains that "[t]he July 2005

26  application further teaches that the waveform may be submitted to further processing

27  and transmitted, for example as shown in relation to Fig. 5 and Fig. 7." Chiang

28

1    Rebuttal to Min Rpt. ¶ 66. In view of these teachings, one of skill in the art would find
2    that Dr. Karabinis possessed the claimed invention as of the July 2005 application.[2]

3         These numerous teachings of "Fourier transform (FFT) and inverse Fourier
4    transform (IFFT) limitations"—as well as the evidence of the "knowledge of what has
5    come before" possessed by one of skill in the art— preclude a finding, as a matter of
6    law, that any claims of the '393, '230, and '606 cannot claim priority to the July 2005
7    application or the May 2006 application. The July 2005 application (and May 2006
8    application) provides written description for the "Fourier transform (FFT) and inverse
9    Fourier transform (IFFT) limitations" of the '393, '230, and '606 claims.

10        **C.    Defendants' LTE Products Infringe The Asserted Claims That**
11             **Require A "Waveform Alphabet."**

12             **1.    Defendants' LTE Products Use Waveform Alphabets.**

13                  **a.    Defendants improperly narrow the Court's construction**
14                       **of the "waveform alphabet."**

15

16

17

18                                                    However, these arguments are not
19    grounded in the Court's construction. The Court defined a "waveform alphabet" to be
20    "a set of discrete-time waveforms that correspond to a set of specific information
21    symbols." *See* Chiang Core Rpt. at 13 (citing the Court's claim construction order).

22

23

24                                        *Multimedia Patent Tr. v. Apple Inc.*, 2012 U.S.

25

26    [2]

27

28

MCKOOL SMITH, P.C.
AUSTIN, TX

Dist. LEXIS 191199, at *20-21 (S.D. Cal. Nov. 20, 2012) (not allowing a party to argue, through expert testimony, a new claim meaning that deviated from the Court's construction of the claim term); *see also TiVo, Inc. v. Echostar Communs. Corp.*, 516 F.3d 1290, 1311-12 (Fed. Cir. 2008) (limiting expert's testimony to the court's claim construction).

> **b.** **Whether LTE devices satisfy the "waveform alphabet" requirement is a factual dispute.**

███████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████

As explained by Dr. Chiang, the waveform alphabet in LTE is defined by the correspondence between information symbols input to LTE's Transform Precoder and waveforms generated by LTE's SC-FDMA signal generator. Chiang Core Rpt. ¶¶ 135, 137; *see also*, *e.g.*, Chiang Infringement Chart for '940 Patent at 58-59. ████████ ██████████████████████████████████████████████████ ██████████████████████ Only those waveforms that can be generated by the mathematical operations specified in the LTE Standard comprise the LTE waveform alphabet. *See* Chiang Infringement Chart for '940 Patent at 58-61. Each waveform in the alphabet corresponds to an information symbol, just as required by the Court's constructions of "waveform alphabet" (claim term 27), "mapping by the processor the information symbol sequence $\{I_k\}$ into a waveform sequence $\{U_k(nT)\}$" (claim term 19), and "a processor that is configured . . . to map the information symbol sequence $\{I_k\}$ into a waveform sequence $\{U_k(nT)\}$" (claim term 23). *See* Chiang Core Rpt. at 12-13 (citing the Court's claim construction order); Chiang Infringement Chart for

McKool Smith, P.C.
Austin, TX

'940 Patent at 58-59; 3GPP TS 36.211 § 5.3. Each information symbol is a set of complex-valued symbols that is input to the Transform Precoder in LTE. Chiang Infringement Chart for '940 Patent at 58-59; 3GPP TS 36.211 § 5.3.3.

The correspondence between information symbols and waveforms that defines LTE's waveform alphabet is illustrated below in annotated Figure 5.3-1 from the LTE Standard. 3GPP TS 36.211 § 5.3. The "modulation mapper" outputs what the LTE Standard calls a "block of complex-valued symbols." 3GPP TS 36.211 § 5.3.2. Each complex-valued symbol within the block of complex-valued symbols represents and corresponds to a particular sequence of bits.[3] ███████████ The block of complex-valued symbols is then divided into sets of complex-valued symbols, where each set of complex-valued symbols is input to the Transform Precoder. Chiang Tr. at 334:8-13; 338:12-21 and 354:1-11. In the annotated example below, the set of complex-valued symbols input to the Transform Precoder contains 12 complex-valued symbols, labeled $d(0), \ldots, d(11)$.



Because each complex-valued symbol represents a particular sequence of bits, each set of complex-valued symbols also represents a (longer) sequence of bits.[4] Chiang

---

[3] The number of bits that correspond to each modulation mapped symbol varies depending on the modulation scheme. For example, QPSK modulation uses four different modulation mapped symbols, each of which corresponds to two bits. Chiang Tr. at 358:6-9.

[4] For example, in the case of QPSK modulation, where each modulation mapped symbol represents a particular sequence of two bits, a block of 12 complex-valued symbols input to the Transform Precoder represents a particular sequence of 2x12=24 bits. 3GPP TS 36.211 §5.3.2.

Infringement Chart for '940 Patent at 58. The sets of complex-valued symbols are therefore "information symbols," as that term is commonly understood and used in the asserted claims. Chiang Tr. at 332:10-14; 338:12-21, and 353:24-354:21; *see also* Acampora Decl. ISO Defendants' Opening Claim Construction Brief ¶ 23 ("Bits are often organized into groups known as 'symbols,' with each symbol representing a particular sequence of bits.").

There is disagreement among the parties' experts, and whether the Accused Products satisfy the "waveform alphabet" requirement is a genuine issue of material fact. Summary judgment is inappropriate.

### c. There is correspondence in LTE between the information symbols and the output waveforms.

The Court's claim construction requires a waveform alphabet to be "a set of discrete-time waveforms that correspond to a set of specific information symbols," (Chiang Core Rpt. at 13 (citing the Court's claim construction order)) which is precisely what exists in LTE. As illustrated in annotated Figure 5.3-1 above, each set of complex-valued symbols input to the Transform Precoder, in this case the set of symbols $d(0)$, . . . , $d(11)$, is an "information symbol" that corresponds to the "resulting waveform" appearing at the output of the SC-FDMA signal generation block. Chiang Infringement Chart for '940 Patent at 58-59.

The correspondence between the inputs to the Transform Precoder of LTE and the outputs of the SC-FDMA Signal Generator is plainly depicted in the LTE Standard. Chiang Core Rpt. ¶ 137.

McKool Smith, P.C.
Austin, TX

1
2
3
4
5
6
7
8
9
10

McKool Smith, P.C.
Austin, TX



The "information symbols" are input to the Transform Precoder. The output of the Transform Precoder is routed by the Resource Element Mapper to the input of the SC-FDMA Signal Generator. The output of the SC-FDMA Signal Generator is the "waveform" that corresponds to the "information symbol" that was input to the Transform Precoder. Chiang Infringement Chart for '940 Patent at 58-59. Breaking down each operation in the chain illustrated in Figure 5.3-1, the correspondence between the "information symbols" and the "waveforms" is defined by mathematical equations that are specified in the LTE Standard.

Each set of complex-valued symbols is said to "correspond to a single SC-FDMA symbol." Chiang Tr. at 332:10-14 and 353:24-354:21; 3GPP TS 36.211 § 5.3.3. The Transform Precoder performs the Fourier transform operation defined in section 3GPP TS 36.211 § 5.3.3 on these sets of complex-valued symbols:

McKool Smith, P.C.
Austin, TX

### 5.3.3    Transform precoding

The block of complex-valued symbols $d(0),\dots,d(M_{symb}-1)$ is divided into $M_{symb}/M_{sc}^{PUSCH}$ sets, each corresponding to one SC-FDMA symbol. Transform precoding shall be applied according to

$$z(l \cdot M_{sc}^{PUSCH} + k) = \frac{1}{\sqrt{M_{sc}^{PUSCH}}} \sum_{i=0}^{M_{sc}^{PUSCH}-1} d(l \cdot M_{sc}^{PUSCH} + i) e^{-j\frac{2\pi i k}{M_{sc}^{PUSCH}}}$$

$$k = 0,\dots, M_{sc}^{PUSCH}-1$$
$$l = 0,\dots, M_{symb}/M_{sc}^{PUSCH}-1$$

resulting in a block of complex-valued symbols $z(0),\dots,z(M_{symb}-1)$. The variable $M_{sc}^{PUSCH} = M_{RB}^{PUSCH} \cdot N_{sc}^{RB}$, where $M_{RB}^{PUSCH}$ represents the bandwidth of the PUSCH in terms of resource blocks, and shall fulfil

$$M_{RB}^{PUSCH} = 2^{\alpha_2} \cdot 3^{\alpha_3} \cdot 5^{\alpha_5} \leq N_{RB}^{UL}$$

where $\alpha_2, \alpha_3, \alpha_5$ is a set of non-negative integers.

The result of the Fourier transform operations is a block of complex-valued symbols $z(0), \dots, z(M_{symb}-1)$. Chiang Infringement Chart for '940 Patent at 58-59. 3GPP TS 36.211 § 5.3.3. The Transform Precoder outputs block $z(0), \dots, z(M_{symb}-1)$, which is provided to the Resource Element Mapper, resulting in "the mapping to resource elements $(k,l)$ corresponding to the physical resource blocks assigned for transmission." Chiang Infringement Chart for '940 Patent at 59; 3GPP TS 36.211 § 5.3.4, ████████████████████

### 5.3.4    Mapping to physical resources

The block of complex-valued symbols $z(0),\dots z(M_{symb}-1)$ shall be multiplied with the amplitude scaling factor $\beta_{PUSCH}$ in order to conform to the transmit power $P_{PUSCH}$ specified in Section 5.1.1.1 in [4], and mapped in sequence starting with $z(0)$ to physical resource blocks assigned for transmission of PUSCH. The mapping to resource elements $(k,l)$ corresponding to the physical resource blocks assigned for transmission and not used for transmission of reference signals and not reserved for possible SRS transmission shall be in increasing order of first the index $k$, then the index $l$, starting with the first slot in the subframe.

The Transform Precoder outputs, designated as resource elements $(k,l)$ after processing by the Resource Element Mapper, are in turn used as inputs to the SC-FDMA Signal Generator. The SC-FDMA Signal Generator takes these inputs and generates discrete time waveforms by using an inverse Fourier transform operation:

### 5.6    SC-FDMA baseband signal generation

This section applies to all uplink physical signals and physical channels except the physical random access channel.

The time-continuous signal $s_l(t)$ in SC-FDMA symbol $l$ in an uplink slot is defined by

$$s_l(t) = \sum_{k=-\lfloor N_{RB}^{UL}N_{sc}^{RB}/2 \rfloor}^{\left\lceil N_{RB}^{UL}N_{sc}^{RB}/2 \right\rceil - 1} a_{k^{(-)},l} \cdot e^{j2\pi(k+1/2)\Delta f(t-N_{CP,l}T_s)}$$

for $0 \leq t < (N_{CP,l}+N) \times T_s$ where $k^{(-)} = k + \lfloor N_{RB}^{UL}N_{sc}^{RB}/2 \rfloor$, $N = 2048$, $\Delta f = 15$ kHz and $a_{k,l}$ is the content of resource element $(k,l)$.

1    Chiang Infringement Chart for '940 Patent at 59; 3GPP TS 36.211 § 5.6.

2        In the equations above, each $a_{k,l}$ is the content of resource element $(k,l)$[5] and is

3    part of the inverse Fourier transform within the SC-FDMA Signal Generator. 3GPP

4    TS 36.211 § 5.6, ███████████████████ The output of the SC-FDMA Signal

5    Generator is the signal $s_l(t)$, which is the "waveform." Chiang Infringement Chart for

6    '940 Patent at 59.

7        Thus, each of the waveforms output by the SC-FDMA Signal Generator

8    corresponds to a specific "information symbol" that exists at the input to the

9    Transform Precoder. Chiang Infringement Chart for '940 Patent at 58-60. This

10   correspondence between "information symbols" and "waveforms" defines "a set of

11   discrete-time waveforms that correspond to a set of specific information symbols," as

12   required by the Court's construction of "waveform alphabet." *See* Chiang Core Rpt. at

13   13 (citing the Court's claim construction order).

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17   ████████████████████████████████████████

18   ███████████████████████████ Defendants do not consider

19   Odyssey's actual infringement theory, which is that the entire complex-valued symbol

20   set $d(0)\ldots d(M_{symb}-1)$ that "corresponds to an SC-FDMA symbol" (3GPP TS 36.211 §

21   5.3.3) is the "information symbol" called for by the claims. Chiang Infringement

22   Chart for '940 Patent at 58. In fact, Defendants' expert admitted during claim

23   construction that a symbol, such as the information symbol Odyssey points to, is a

24

25   _____

26   [5] As Dr. Chiang explains, within the "resource element mapping . . . the results of the transform precoding step are mapped to specific physical resources, or subcarriers, of the transmission channel." Chiang Infringement Chart for '940 Patent at 59. As such,

27   the coefficients $a_{k,l}$ within the Resource Element mapper are "frequency content" as

28   called for by the claims.

MCKOOL SMITH, P.C.
AUSTIN, TX

1   group of bits, where each symbol represents a particular sequence of bits. *See*

2   Acampora Decl. ISO Defendants' Opening Claim Construction Brief ¶ 23.

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████

10        **d.     Defendants' remaining attacks on Odyssey's waveform**

11             **alphabet theory fail.**

12        As explained above, and by Dr. Chiang in his expert report, the input to the

13   Fourier transform in the Transform Precoder of LTE is an information symbol, and

14   there is a correspondence between that information symbol and the waveform

15   produced by the inverse Fourier Transform in the SC-FDMA Signal Generator.

16   Chiang Core Rpt. ¶ 137; Chiang Tr. at 332:10-14 and 353:24-354:21.

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████

23    ███████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

26   ███████████████████████       It is well known that a set need not contain only

27   a certain number of members. For example, the set of all positive integers (*i.e.*,{1, 2,

28

MCKOOL SMITH, P.C.
AUSTIN, TX

McKool Smith, P.C.
Austin, TX

1    3, . . .}) has an infinite number of members, ████████████████████

2    ██████    The dictionary definition of "set" is "[a] collection of distinct objects (called

3    elements or members), such that for any object, it can be determined whether the

4    object belongs to the collection." Dictionary of Science and Technology (1992) at

5    1964; *see Cordis Corp v. Boston Scientific Corp.*, 658 F.3d 1347, 1356 (Fed. Cir.

6    2011) (approving of trial court's reference to a dictionary for the "ordinary meaning of

7    the construction"). The Couch textbook that Defendants cited as prior art defines a set

8    as "a collection (or class) of objects." Couch at 492. Both definitions of "set" admit a

9    collection or class of waveforms that is extremely large, or even infinite.[6] Defendants

10   have not argued otherwise.

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████    But Defendants' argument once again is

16   directed at an infringement theory that Odyssey has not advanced. Odyssey does not

17   rely on the possibility of generating all possible outputs and matching those outputs to

18   corresponding inputs. Instead, Odyssey points to the waveform alphabet that is

19   defined in LTE by the mathematical correspondence between "information symbols"

20   and "waveforms." Chiang Core Rpt. ¶¶ 135, 137; *see also*, *e.g.*, Chiang Infringement

21   Chart for '940 Patent at 58-59. There is no requirement in the Court's construction

22   that members of a waveform alphabet be pre-generated.

23

24

25   _____

26   [6] The Proakis textbook also cited by Defendants as prior art discusses an example that
     verifies that a set of waveforms can contain a very large or even infinite number of

27   waveforms. Proakis at 61. Proakis' example is "the set of all noise voltage waveforms
     generated by resistors" which Proakis explains is "extremely large; often it is infinite."

28   *Id.*

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

LTE defines correspondence between "information symbols" and "waveforms" through the mathematical operations discussed above: for each "information symbol" input to the Transform Precoder there is a corresponding output from the SC-FDMA Signal Generator. Chiang Infringement Chart for '940 Patent at 58-61. LTE's use of the mathematical equations (as opposed to a pre-generated look-up table) to define correspondence between "waveforms" and "information symbols" allows for its large waveform alphabet to be realized.[7]

A waveform alphabet is "a set of discrete-time waveforms that correspond to a set of specific information symbols." *See* Chiang Core Rpt. at 13 (citing the Court's claim construction order). It is true, of course, that a "set" can be defined by generating and listing all of the members of the collection. But it is equally true that a set can be defined semantically (*e.g.,* by defining the class of set members by mathematical equations), without listing or generating any or all of its members.[8] *See, e.g.,* Couch at 493-494 (providing an example that defines "the set containing all types of milk shakes"). The "set of all positive integers"—████████████████

[7] ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

It is not even possible to list or generate all members of a set which, like the set of positive integers, has an infinite number of members.

1 ███████████████ presents another instance of a set that can be defined

2 without generating all of its members.

3    Contrary to Defendants' suggestion, none of the Court's constructions require

4 generating the waveforms in the waveform alphabet before they are needed. ███████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ███████

9    The Federal Circuit considered a similar issue recently when it decided that

10 "selecting" an object does not require the object to exist prior to the selection: "it is

11 beyond cavil that the plain and ordinary meaning of the term 'selecting' can naturally

12 refer to a choice of a not-yet extant object. Parties regularly select any number of

13 things that do not exist when the selection is made and are only later made to order."

14 *Tecsec, Inc. v. Adobe Sys.,* 2016 U.S. App. LEXIS 15149, *11, *18 (Fed. Cir. Aug.

15 18, 2016) (non-precedential) (vacating the District Court's finding that "before one

16 can select an object, the object must pre-exist"). Likewise, a waveform assigned to a

17 symbol or chosen from a waveform alphabet need not have been created prior to the

18 assignment or choosing.

19    Defendants are not entitled to summary judgment based on "waveform

20 alphabet." Defendants' attacks on theories Odyssey has not advanced carry no weight,

21 and Defendants' arguments based on the notion that a "waveform alphabet" must be

22 pre-generated and contain a certain number of waveforms are wrong. At best,

23 Defendants' arguments highlight disagreements between the parties' experts and

24 genuine issues of material fact that preclude summary judgment.

25    **e.    Defendants' other arguments do not eliminate factual**

26    **disputes.**

This deviation from the Court's construction—by opining on what the Court's construction "suggests"—is improper. *Patent Tr. v. Apple Inc.*, 2012 U.S. Dist. LEXIS 191199 at *20-21; *TiVo, Inc. v. Echostar Communs. Corp.*, 516 F.3d at 1311-12. Even so, as explained above and by Dr. Chiang, the steps of the Transform Precoder, Resource Element Mapper, and SC-FDMA Signal Generation in LTE do "choose" and "assign" the waveform that corresponds to each of the information symbols. *See* Chiang Infringement Chart for '940 Patent at 58-59; Chiang Tr. at 352:10-14 and 353:24-354:21; *see also* Chiang Core Rpt. at 12-13 (citing the Court's claim construction order). This is accomplished through the use of the mathematical equations in the LTE Standard detailed above and in Dr. Chiang's Opening Report. Chiang Infringement Chart for '940 Patent at 58-59.

The Court's construction of "waveform alphabet" requires nothing more.

1

2

3

4

5 That claim limitation, however, is not found in the

6 Asserted Claims. *Id.* ¶ 43.

7

8

9

10

11

12

13

14 Defendants find no help in

15 the '845 patent file history.

16 **2.    Odyssey's Doctrine Of Equivalents Arguments Do Not Fail As**

17 **A Matter Of Law.**

18

19 Defendants are

20 incorrect.

21

22

23

24

25

26 As required, Dr.

27 Chiang provides "particularized testimony and linking argument" to the remainder of

28

McKool Smith, P.C.
Austin, TX

his expert report relevant to the satisfaction of the "waveform alphabet" requirement in LTE. *Texas Instruments v. Cypress Semiconductor*, 90 F.3d 1558, 1567-68 (Fed. Cir. 1996). The analysis found throughout Dr. Chiang's report provides more than enough particularized factual testimony to ensure that the "jury is provided with the proper evidentiary foundation from which it may permissibly conclude that a claim limitation has been met by an equivalent." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1188 (Fed. Cir. 1998).

### D.   The Asserted "Frequency Variation" Claims Are Not Obvious.

#### 1.   Galda Does Not Teach Or Suggest "Frequency Variation."

In this vein, Dr. Chiang provided the opinion that Galda "teaches away from the notion of varying allotted frequencies and varying a bandwidth." Galda Appendix in Chiang Rebuttal to Min Rpt. ¶ 9. As Dr. Chiang explained, Galda teaches that each individual user is "exclusively allotted" a group of subcarriers, and "simply 'assigning another set of frequencies' to a user is not possible." Galda Appendix in Chiang Rebuttal to Min Rpt. ¶¶ 8-9, 14; Galda at 1738.  Comporting with Galda's teaching that a user's subcarrier allotment is "exclusive," Dr. Chiang explains "there is no disclosure in Galda of a dynamic subcarrier allocation scheme." Galda Appendix in Chiang Rebuttal to Min Rpt. ¶¶ 8-9, 16.

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ███████████████████████████████. Because there is no re-allotment of

4 subcarriers, Galda does not disclose "using a second plurality of frequencies over a

5 second time interval." ██████████████████████████████

6 ████████████████████████████████████████████████

7 ███████████████████ Even viewing the evidence in the light most favorable to

8 *Defendants*, there is a genuine dispute of material fact foreclosing summary judgment.

9 █████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████ Thus, genuine

15 questions of fact surround the teachings of Galda, ████████████████████

16 ████████████████████████████████████████████████

17 ███████████████████████ As such, summary judgment must be

18 denied.

19

20 [9] ████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████ Dr.

24 Chiang correctly gave the unconstructed "plurality of frequency" terms their common

25 meanings. *See*, *e.g.*, Federal Circuit Bar Association Model Patent Jury Instructions

26 (January 2016) § 2:3 ("For any words in the claim for which I have not provided you

27 with a definition, you should apply their common meaning."); *see also Cordis Corp v.*

28 *Boston Scientific Corp.*, 658 F.3d 1347, 1356 (Fed. Cir. 2011) (Court referring to

dictionary for the "ordinary meaning of the construction"). The plain meaning of

"plurality" is "a number greater than one." *Webster's Encyclopedic Unabridged*

MCKOOL SMITH, P.C.
AUSTIN, TX

McKool Smith, P.C.
Austin, TX

1

2.       **Odyssey's Secondary Considerations Of Nonobviousness Are**
2               **Legally Sufficient And Present Issues To Be Considered By**
3               **The Trier Of Fact.**

4         Secondary considerations are necessarily dependent on factual determinations.
5 *See Zoltek Corp. v. United States*, 95 Fed. Cl. 681, 702 (Fed. Cl. 2010). As a result,
6 secondary considerations are likely to raise genuine issues of material fact. *See*
7 *Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech. (USA), Inc.*, 542
8 F.3d 1363, 1377 (Fed. Cir. 2008) ("The secondary consideration evidence, like the
9 evidence with regard to the primary considerations, thus presents factual issues for a
10 trier of fact."). Secondary considerations are also likely to aid the jury in their
11 obviousness determination, since they "give light to the circumstances surrounding the
12 origin of the subject matter sought to be patented." *Graham v. John Deere Co. of*
13 *Kansas City*, 383 U.S. 1, 17–18 (1966). Given the fact-based nature of secondary
14 considerations, as well as their potential to aid the jury, little is required for evidence
15 of secondary considerations to be submitted to the jury. In fact, evidence of secondary
16 considerations merely needs to rise above the level of "[b]are assertions" and
17 "unsupported contentions" in order to be "legally [sufficient] to raise a genuine issue
18 of material fact." *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1333 (Fed.
19 Cir. 2009).

20         Here, the evidence of secondary considerations easily clears that low threshold.
21 Dr. Chiang specifically referenced numerous secondary considerations, including the
22 failures of prior art, the commercial success of devices incorporating Odyssey's
23 technology, and the long-felt need for the Odyssey's patented technology. *See* Chiang

24

25 *Dictionary of the English Language* (1996). Thus, the plain meaning of "a plurality of
frequencies" is "a number, greater than one, of frequencies." Thus, as Dr. Chiang
26 explained, a "first plurality of frequencies" differs from a "second plurality of
frequencies" if the first number of frequencies differs from the second number of
27 frequencies. Chiang Tr. at 131:10-13.

28

Rebuttal to Min Rpt. ¶¶ 127-143. These considerations are not general statements about the success of LTE—they are specific comments that link Odyssey's patents to an unfilled need. ██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████. Each claim is also backed by numerous secondary sources ████████████████████████ unlike those secondary considerations that are likely to be excluded. *See, e.g., Perfect Web*, 587 F.3d at 1333 (excluding evidence of secondary consideration where the expert "cited no supporting data"). Far from being the bare assertions, the evidence of secondary considerations Dr. Chiang analyzes provides light to the circumstances surrounding the creation of the invention at issue. The considerations should be presented to the jury, and the Defendants' motion should be denied.

**E.    The Court Should Not Grant Summary Judgment on Damages.**

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████

**IV    CONCLUSION**

As detailed above, the Court should deny Defendants' motion for summary judgment.

1

2 DATED: August 29, 2016                    Respectfully submitted,

3                                           MCKOOL SMITH, P.C.

4

5                                           By  */s/ John B. Campbell*

6                                           John B. Campbell

7

8                                           Attorney for Plaintiff
                                            ODYSSEY WIRELESS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

## CERTIFICATE OF SERVICE

3

4       The undersigned hereby certifies that a true and correct copy of the foregoing

5  document has been served on this date to all counsel of record who are deemed to

6  have consented to electronic service via the Court's CM/ECF system per CivLR

7  5.4(d).

8       I declare under penalty of perjury of the laws of the United States that the

9  foregoing is true and correct. Executed August 29, 2016 at Austin, Texas.

10

11                    */s/ Matt Rappaport*

12                    Matt Rappaport

13

McKool Smith, P.C.
Austin, TX